UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 1:11CR116 |
| v. | ) | |
| | ) | The Honorable Claude M. Hilton |
| THOMAS J. ERNST, | ) | |
| | ) | |
| Defendant | ) | Hearing Date:  December 16, 2011 |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through undersigned counsel, and in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual, files this Position of the United States with Respect to Sentencing in the instant case. The United States asks that the Court impose a variance sentence of **75 months**, which is higher than the properly calculated Sentencing Guidelines range of **51 to 63 months**.  An upward-variance sentence appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

**BACKGROUND**

On March 10, 2011, a six-count Indictment was filed in the Eastern District of Virginia charging Defendant Thomas J. Ernst ("Defendant") with criminal offenses arising under the Internal Revenue Code, including corruptly endeavoring to obstruct or impede the Internal Revenue Service, in violation of 26 U.S.C. § 7212(a), tax evasion, in violation of 26 U.S.C. § 7201, and failure to file an income tax return, in violation of 26 U.S.C. § 7203.  At a hearing before this Court on July 26, 2011, Defendant pled guilty to one count of corruptly endeavoring

1

to obstruct or impede the Internal Revenue Service (count one), and one count of tax evasion (count three).

Defendant was the president and chief executive officer of Medicure Plus, Inc. ("Medicure"), a now-defunct company previously based in Northern Virginia. Beginning in 2000 and lasting through early 2006, Medicure operated as the third-party administrator of the Postmasters' Benefits Plan ("PBP"), the health benefits carrier for the National League of Postmasters ("NLP"). Defendant obtained this contract by providing a guarantee and irrevocable assignment of revenue bonds that purportedly had a combined aggregate face value of $10 million, but that were later found to be fraudulent. In short, Medicure was supposed to administer the health plan, help policyholders receive adequate coverage, and ensure that the health plan remained financially solvent. The revenue bond guaranteed that policyholders would be covered if the plan became financially insolvent. For its services, Medicure received a monthly management fee of $166,000 plus a $33,000 administrative fee.

Because PBP participated in the Federal Employees Health Benefits Plan (FEHBP), it was subject to audit by the Office of Personnel Management ("OPM"). In 2004 and 2005, OPM completed an audit of the PBP, which noted severe problems with Medicure's management. The audit uncovered that the arrangement with Medicure had been entered into without OPM's authorization, directly violating the laws and regulations governing the FEHBP. Medicure had also mismanaged PBP and the plan was in financial turmoil. Of grave concern was the fact that Defendant had been using Medicure's funds for various personal expenditures. Following the discovery of this information, Medicure lost this contract.

The Internal Revenue Service ("IRS") subsequently launched a criminal investigation into Defendant's actions. The investigation determined that Defendant had indeed used the fees

earned from this contract for personal expenditures. The IRS determined that Defendant had used millions of dollars from Medicure's accounts to pay for various personal expenditures, including rental properties, a summer home, and his son's college tuition, and to make substantial cash payments to himself and his family members. Defendant not only failed to claim these expenses on his personal income tax returns, he took affirmative steps to hide his income, including using nominee entities to hide assets, purchasing and leasing assets in the names of family members, and creating fictitious legal documents in the names of his family members. The IRS and OPM investigations also determined that the bond offered by Defendant for the contract was nonexistent. In other words, Medicure obtained the health-care contract by offering a bond that the company never actually possessed. Additionally, from 2001 to 2006, Defendant failed to file *any* personal tax returns for himself. Indeed, Defendant had not filed taxes since the early to mid 1990s. He also had not filed corporate tax returns on behalf of Medicure, and failed to collect and pay over employment taxes on behalf of the company's employees. In all, Defendant's criminal conduct resulted in a tax loss totaling $4,490,966.08. This loss consists of Defendant's personal tax liability ($1,684,836) and corporate tax liability ($2,806,130.08).

The penalties for Count 1 -- violation of 26 U.S.C. § 7212(a) -- are a maximum term of imprisonment of three years, a maximum fine of $250,000, a special assessment, restitution, and one year of supervised release. The penalties for Count 3 -- violation of 26 U.S.C. § 7201-- are a maximum term of imprisonment of 5 years, a maximum fine of $250,000, a special assessment, restitution, and three years of supervised release. Under the Sentencing Guidelines and as agreed in his plea agreement, Defendant is responsible for a tax loss of between $2,500,000 and $7,000,000 **(Level 24)**. Additionally, this offense involved sophisticated means under U.S.S.G.

§ 2T1.1(b)(2), increasing Defendant's offense level by two levels. Defendant is in Criminal History Category I and is eligible for a two-level reduction pursuant to U.S.S.G. § 3E1.1(a), as he has admitted his guilt.[1] Accordingly, Defendant's Total Offense Level is **24**, for a Guideline range of **51 to 63 months.**

## GUIDELINES ANALYSIS

### *The Advisory Guidelines were Properly Calculated*

"The government bears the burden of establishing the tax loss by a preponderance of the evidence." *United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010). "The amount of tax loss is not always a precise figure, and 'the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts.'" *Id*. (citing U.S.S.G. § 2T1.1, cmt. n. 1). As previously indicated, Defendant's conduct resulted in a tax loss totaling $4,490,966.08. The IRS calculated Defendant's personal income tax liability and subsequently provided this information to U.S. Probation in a Form 4549-A, Income Tax Discrepancy Adjustments. U.S. Probation calculated Medicure's corporate tax liability by using the percentages found in the Sentencing Guidelines. *See* U.S.S.G. § 2T1.1(c)(2) (tax loss for failure to file a corporate return is equal to 25% of the gross income, unless a more accurate determination can be made). The tax loss calculations adopted in the PSR reasonably demonstrate the total tax loss as they take into account the revenue earned by Medicure as well as the money Defendant took from his company.

The Fourth Circuit has squarely ruled that defendants convicted of tax-related offenses may not claim at sentencing that they were entitled to certain deductions. "Were the district court now to attempt to reconstruct [Defendant's] income tax returns *post hoc*, it would be forced

---

[1] The United States has not moved for a further reduction pursuant to U.S.S.G. § 3E1.1(a), making Defendant ineligible for a third point for acceptance of responsibility.

to speculate as to what deductions they would have claimed and what deductions would have been allowed." *United States v. Delfino*, 510 F.3d 468, 473 (4th Cir. 2007). "The law does not require" district courts to speculate as to what deductions would have been appropriate "nor does it entitle [defendants] to the benefit of deductions they might have claimed now that they stand convicted of tax evasion." *Id.* at 473; *see also United States v. Chavin*, 316 F.3d 666, 679 (7th Cir. 2002); Coley, Timothy J. "Disputed Deductions: *Delfino* and the Fourth Circuit's Prudent Adoption of the Restrictive Approach to Tax Evasion Sentencing," 87 N.C.L. REV. 234, 255 (2008) ("[T]he permissive approach, which allows for the retroactive recognition of deductions, is erroneous, inequitable, and untenable. . . . [C]ourts have by and large acknowledged the superiority of the restrictive approach, as there has been a consistent trend toward its adoption and a corresponding rejection of the permissive approach in recent years."); *but see United States v. Hoskins*, 654 F.3d 1086, 1101 (10th Cir. 2011). In short, the IRS properly used bank records to determine Defendant's personal tax liability and the PSR properly used the formula found in U.S.S.G. § 2T1.1(c)(2) in determining Medicure's corporate tax liability. Because he is not entitled to claim any deductions that he may have previously claimed, Defendant is therefore properly charged with conduct resulting in a tax loss between $2,500,000 and $7,000,000.

Defendant was also properly assessed the sophisticated means enhancement as he engaged in "especially complex or especially intricate offense conduct pertaining to the execution or concealment" of the offense. *See* § 2T1.1(b)(2), comm. 3. Defendant's extensive use of nominee accounts, fraudulent paperwork, and third-party entities to carry out his offenses justify the enhancement. *See generally United States v. Bailey*, 216 Fed. Appx. 378, 385 (4th Cir. 2007) (unpublished) (defendant used nominee accounts and avoided the use of personal accounts); *United States v. Bond*, 181 Fed. Appx. 357, 358 (4th Cir. N.C. 2006) (unpublished)

(defendant used trusts and corporations to mask his ownership). Accordingly, the PSR properly determined that Defendant's Total Offense Level is **24**, for a Guideline range of **51 to 63 months.**

*The Court May Upwardly Vary on the Otherwise Properly Calculated Guidelines Range*

As this Court is undoubtedly aware, in *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court made clear that sentencing courts should "consult [the Sentencing] Guidelines and take them into account when sentencing." *See also United States v. Biheiri*, 356 F.Supp.2d 589, 593 (2005) ("Justice Breyer's majority opinion in [*Booker*] sensibly teaches that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence."). The Fourth Circuit has provided the following guidance in the wake of *Booker*:

> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)-(C); *Biheiri*, 356 F.Supp.2d at 594.

While courts must of course consult the Sentencing Guidelines, they have discretion to impose a sentence that varies upwards. In analyzing the 3553(a) factors, the Court may not presume that the Guidelines range is reasonable. *See Gall v. United States*, 552 U.S. 38, 50 (2007). The court must make "an individualized assessment based on the facts presented. If [the

6

Court] decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* For the reasons that follow, the unique facts of this case warrant a sentence of **75 months**, which varies above the properly calculated Guidelines.[2] The United States requests that the Court impose consecutive sentences of 60 months of incarceration as to tax evasion (26 U.S.C. § 7201) and 15 months as to obstructing the IRS (26 U.S.C. § 7212(a)).

## AN UPWARD VARIANCE IS APPROPRIATE IN THIS CASE

The properly calculated Guidelines do not take into account the seriousness of Defendant's criminal actions nor do they account for the need to protect the community from him or the necessity of sending an effective general deterrence message. A sentence of 75 months appropriately accounts for each of the factors in 18 U.S.C. § 3553(a). In particular, such a sentence reflects the serious nature of this offense, provides just punishment, will promote respect for the law, protects the community, and perhaps most importantly, will send an important message to others about the penalties for such egregious conduct.

*Seriousness of the Offense / Need for a Just Punishment / Promote Respect for the Law*

A sentence of 75 months of incarceration is appropriate as it recognizes the seriousness of Defendant's complex criminal acts, provides a just punishment for his actions, and will promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A). Defendant lived a lavish lifestyle while running Medicure. He used his company's funds to pay for a summer home on the New Jersey shore, a home in Indiana, a personal residence in McLean, Virginia, and various rental properties for his family members. Defendant ensured that he and his family members could continue to enjoy anything they wanted throughout this period, using Medicure's accounts to pay for his

---

[2] This Court has authority to impose consecutive sentences, permitting it to sentence Defendant to a total of 75 months.

7

son's tuition at Georgetown University and purchasing items such as a $45,000 piano for his personal residence.  And of course, Defendant took millions of dollars from Medicure to distribute to himself and his family members as he saw fit.  Defendant only stopped using his company as a personal bank account once Medicure lost the NLP contract and the accompanying monthly payments.

Despite the enormous sums of money that he and his company received from 2000 to 2006, Defendant went to great lengths to avoid paying *any* taxes to the IRS.  Throughout this period, Defendant not only failed to file individual and corporate income tax returns, he also failed to collect, account for, and pay over his employees' withholding taxes, and engaged in a systematic effort to obstruct the IRS's ability to determine his true tax liability.  He did not issue tax documents to his employees or file employee withholding documents with the IRS.  He funneled money from Medicure's bank accounts to various nominee entities, using the nominees to distribute money to himself and family members.  He purchased assets in the names of family members to conceal his ownership.  He created a staggering amount of fictitious legal instruments, including powers of attorney, financial statements, Forms W-2, and corporate and individual income tax returns, all in order to further obstruct the IRS.  In short, for a period lasting at least six years, Defendant took every step he could think of in order to evade his taxes and obstruct the IRS, all while his company earned nearly $200,000 per month, tax free.

Courts have frequently deemed upward variances appropriate when defendants take such extensive measures to evade their responsibilities under the Internal Revenue Code.  In *United States v. Engle*, the Fourth Circuit reversed the district court's imposition of a probationary sentence when the defendant had evaded taxes for sixteen years, altered tax returns, directed that income be paid to shell corporations, and lied to the IRS about the existence of the shell

corporations. 592 F.3d 495, 503 (4th Cir. 2010). In ruling that a probationary sentence was substantively unreasonable because the district court improperly focused on the defendant's ability to pay restitution, the court also noted that the defendant's conduct would perhaps have warranted an above-Guidelines sentence. *Id.* at 503, 505.

Just as in *Engle*, Defendant's noncompliance with the tax code has spanned the course of several years – indeed Defendant has not filed taxes since the 1990s – and involves a profound lack of respect for the law. *See United States v. Baucom*, 2011 U.S. App. LEXIS 9521 at *6-7 (4th Cir. 2011) (unpublished) (holding that upward variance in tax evasion prosecution was appropriate because of the duration of the conduct as well as the defendant's manipulation of the legal process and lack of respect for the law). Defendant did not simply create a few false documents or put assets in the names of others, actions that would by themselves justify a sophisticated means enhancement, he involved family members, sometimes without their knowledge or consent, used various nominee entities, and created a plethora of fraudulent documents. *See United States v. Jackson*, 388 Fed. Appx. 906, 911 (11th Cir. 2010) (upward variance of 12 months appropriate because of Defendant's multiple fraudulent acts and illegal use of third-party identities). Simply put, the properly calculated Guidelines do not take into account the seriousness of Defendant's criminal actions, provide for a just punishment, or ensure that he will respect the law. *See United States v. Barrington*, 270 Fed. Appx. 874, 876 (11th Cir. 2008) (upholding an upward variance in a tax prosecution when the district court found "that the nature and circumstances surrounding the offense, the seriousness of the offense, and other relevant factors outweighed appellant's lack of a criminal history, her limited acceptance of responsibility, and her announced desire to provide restitution.").

Tax evasion and obstructing the IRS are serious crimes and offenders deserve punishments commensurate with their actions. "Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses . . . that in the Commission's view are 'serious.'" *United States v. Tomko*, 562 F.3d 558, 587 (3d Cir. 2009) (citing U.S. Sentencing Guidelines Manual ch. 1, pt. A, introductory cmt. 4(d)). "To reduce sentencing disparities, the Guidelines sought to ensure more tax evaders were sentenced to prison, specifically focusing on those who evaded more than $100,000 in federal taxes." *United States v. Ture*, 450 F.3d 352, 358-359 (8th Cir. 2006). A sentence of 75 months is a just punishment in this case given Defendant's willingness to engage in extremely serious conduct over an extended period of time.

Given the seriousness of Defendant's criminal conduct, only a very lengthy sentence is likely to cause him to gain respect for the law. As is now clear, Defendant stole nearly $4.5 million dollars from the U.S. Treasury through a series of varied and complex measures. He has proved willing to engage in sophisticated criminal conduct for lengthy periods of time and has continued to engage in fraudulent and deceptive practices that affect governmental entities like the IRS and the U.S. Treasury, businesses and organizations like the NLP, and even his own family members. Only a very lengthy sentence imposed by this Court will instill in Defendant a respect for the law. *See Baucom*, 2011 U.S. App. LEXIS 9521 at *6-7. A sentence of 75 months recognizes the seriousness of Defendant's actions, provides for a just punishment, and will ensure that he will respect the law.

*Protection of the Community*

A variance sentence would certainly be appropriate simply because of the serious nature of his actions, the need for a just punishment, and the need to promote respect for the law. A

lengthy period of incarceration is also necessary to protect the community from future actions of Defendant. Defendant has already proven he is willing to steal millions of dollars through complex schemes. His ongoing criminal and fraudulent conduct is a threat not just to the U.S. Treasury but to members of the community. Defendant created fictitious legal documents in the names of family members, to include his two sons. While Defendant did this to obstruct the IRS, he has a history of this behavior, even taking mortgages out in the names of his sons without their knowledge or consent. *See, e.g. United States v. Aldridge*, 561 F.3d 759, 763 (8th Cir. 2009) (upholding upward variance because the Guidelines did not adequately account for the harm to and number of third-parties).

In the midst of Defendant's ongoing theft from the United States Treasury, his business dealings also had a severe impact on others. Medicure itself appears to have obtained the contract with NLP under fraudulent pretenses. The OPM audit confirmed that the contract was obtained without complying with the applicable laws and regulations. Additionally, employees discovered that the multi-million dollar bond offered by Medicure to ensure the solvency of policyholders' health plans did not exist. Defendant continuously lied about the existence of the bond so that Medicure could keep its contract with NLP and he could keep making enormous tax-free profits. In a 2003 online forum conducted by the Washington Post, Defendant encouraged active and retired federal workers to join his health plan, informing readers that, "[o]ne does not have to be a Postmaster to join PBP. Any retiree and any active worker can join PBP . . . Medicure Plus is a group of health care management experts who have greatly improved PBP." In extolling his plan, Defendant stated that "PBP offers world class quality care. Three biggest and best reasons to join PBP are (1) quality, (2) quality, and (3) quality." Defendant failed to tell his audience that Medicure had not complied with federal law when

obtaining the contract, that the multi-million bond safeguarding policies was non-existent, that he was using Medicure, and by extension the health care plan, as his own personal bank account while the plan was having serious financial problems, or that he had taken every possible measure to ensure he and his company could avoid paying taxes.  Washington Post, Federal Diary Live (Dec. 3, 2003).[3]  Defendant deemed it appropriate to continue to encourage federal workers to give him money while he persisted in evading the payment of both his and his company's federal taxes.

Defendant's fraudulent conduct has continued past his July 26, 2011 plea hearing.  He submitted dozens of documents to his probation officer suggesting that he has deeds for Colorado mines purportedly worth three to eight-hundred million dollars and industrial revenue bonds that could potentially be worth between one and two million dollars.  According to Defendant, he plans to use these assets to purchase a multi-million dollar discount health company in Houston, Texas.  Despite his claims of newfound success in such difficult economic times, Defendant has completed financial affidavits before this Court entitling him to CJA representation and has filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of New Jersey several times over the past year.[4]

The documents submitted to U.S. Probation serve as yet another example of Defendant's persistent fraudulent conduct.  From 2008 to 2011, Defendant sought to obtain money for these mining deeds until one of his business associates determined that he never actually owned the

---

[3] Washington Post online forum available at http://www.washingtonpost.com/wp-dyn/articles/A16325-2003Nov26.html

[4] Of note, in his most recent bankruptcy petition, Defendant stated that these mining contracts are worth a mere fourteen million dollars.  *In re Ernst* 11-35735, Docket No. 1 (Bankr. D. N.J, August 31, 2011).  It is unclear why he claimed to his probation officer that they might be worth eight-hundred million dollars.

mines.[5] Despite his admission of guilt and supposed acceptance of responsibility in this case, Defendant persists in using documents that falsely suggest he has millions of dollars at his disposal. Even if Defendant truly believes he has these assets, he fails to explain why he would not have used them to pay the enormous amount of back taxes he admits to owing the IRS. His comments to his probation officer suggest that he is more concerned with purchasing another healthcare company than making amends for his criminal conduct.[6]

The conduct described above cannot be described as an aberration, but as part of a pattern of fraudulent behavior. As described in the PSR, Defendant was convicted of passing bad checks and stealing by means of deception in 1986. This led to the suspension of his law license. He stands before this Court convicted of tax evasion and obstructing the IRS. In the course of committing tax offenses, Defendant used his sons' personal information to get mortgages, deceived the NLP, has attempted to deceive potential buyers of mining contracts, and has provided documents to this Court that are of a dubious, if not outright fraudulent nature. Defendant apparently believes that he can continue to draft false documents, continue to engage in deceptive business practices, and continue to deceive federal entities. The pattern of fraudulent activity that continues to this day justifies a variance from the properly calculated Guidelines. Nothing short of a lengthy period of incarceration will protect the community from Defendant's actions.

---

[5] This particular individual subsequently filed charges against Defendant for theft of services. *See* PSR ¶ 55.

[6] Assuming that some or all of these multi-million dollar contracts do in fact exist, the United States would of course expect that Defendant will agree to redeem them immediately as a means of demonstrating his sincere acceptance of responsibility and in order to comply with the restitution provisions of his plea agreement.

*General Deterrence*

A variance sentence of 75 months is lastly appropriate as it will send a critical message to others that there are severe consequences for complex schemes to evade taxes and obstruct the efforts of the IRS. As detailed by the Sentencing Commission, "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." *Engle*, 592 F.3d at 502 (citing U.S.S.G. Ch. 2, Pt. T, introductory cmt. (1998)). Indeed, the Fourth Circuit has explicitly endorsed the importance of incarcerating tax scofflaws as a means of general deterrence:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*Engle*, 592 F.3d at 502 (citing U.S.S.G. Ch. 2, Pt. T, introductory cmt. (1998)). "[D]eterrence is a primary consideration in choosing the appropriate sentence for any tax crime, newsworthy or not." *United States v. Gardellini*, 545 F.3d 1089, 1098 (D.C. Cir. 2008) (dissent, Williams J.). The government cannot ensure compliance with the Internal Revenue Code if the general public believes there are no repercussions for failing to comply with tax laws and regulations. The conclusion in *Engle* is all the more true in cases where the defendant has engaged in such complex criminal conduct. Sentencing Defendant to a period of incarceration above the properly calculated Guidelines will send a message to others that systematic efforts to evade one's taxes and obstruct the services of the IRS will be met with harsh punishment.

General deterrence is an essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud. "The IRS estimates that [as of tax year 2001], tax fraud on individual income tax returns generate[d] revenue losses of about $197 billion a year (not counting $25 billion in losses from nonfiling)." *Gardellini*, 545 F.3d at 1097 (dissent, Williams J.) (citing Internal Revenue Service, "Reducing the Federal Tax Gap: A Report on Improving Voluntary Compliance," 10 (Aug. 2, 2007) (2001 tax year)).[7] In an addendum revising the tax year 2001 loss amounts, the IRS reported that "the overall gross tax gap was estimated to be approximately *$345 billion* . . . . After accounting for enforcement efforts and late payments, the amount was reduced to $290 billion." Internal Revenue Service, "Update on Reducing the Federal Tax Gap and Improving Voluntary Compliance," appx. iii (July 8, 2009) (emphasis added).[8]

These studies emphasize the impact that noncompliance with the tax code has on the U.S. Treasury. Hundreds of billions of dollars are lost annually because people like Defendant choose to shirk their responsibilities as American taxpayers. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits any court's consideration when sentencing defendants for committing tax offenses. This is all the more true in cases such as this, where defendants have engaged in complex schemes to defraud the government. Severe sentences must be given in cases such as this so that others are forewarned of the consequences for engaging in such complex tax crimes.

---

[7] IRS publication available at http://www.irs.gov/pub/irs-news/tax_gap_report_final_080207_linked.pdf

[8] IRS publication available at http://www.irs.gov/pub/newsroom/tax_gap_report_-final_version.pdf.

## **CONCLUSION**

A period of 75 months of incarceration is appropriate as it will effectively deter others from committing similar offenses, protects the public from Defendant, recognizes the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. Because of the reasons outlined in this position paper, an upward variance is appropriate.

Respectfully submitted,

Neil H. MacBride
United States Attorney

_____/s/_____
Charles Connolly
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Email: charles.connolly@usdoj.gov

_____/s/_____
Caryn Finley
Special Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 202-514-5051
Email: caryn.finley@usdoj.gov

_____/s/_____
Thomas J. Krepp
Special Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 202-353-7517
Email: thomas.j.krepp@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2011 I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing

(NEF) to the following:

**Peter Linn Goldman**
526 King Street
Suite 213
Alexandria, VA 22314
(703) 684-6476
Fax: 703-548-8935
Email: pgoldmanatty@aol.com


A courtesy copy will be delivered via e-mail to:

**Joanne Lauder**
U.S. Probation Officer
401 Courthouse Square
Alexandria, VA 22314
Tel:  (703) 299-2300


        By:     /s/
        Thomas J. Krepp
        Special Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: 202-353-7517
        Email: thomas.j.krepp@usdoj.gov