UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES OF AMERICA,          )
                                   )   Case No. 1:11-cr-116
          v.                       )   Alexandria, Virginia
                                   )
THOMAS J. ERNST,                   )   December 16, 2011
                                   )   9:09 a.m.
          Defendant.               )
                                   )

_____


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE










APPEARANCES:

For the United States:     Thomas J. Krepp, Esq.
                           Charles Connolly, Esq.

For the Defendant:         Peter L. Goldman, Esq.
                           Defendant Thomas J. Ernst,
                           in person

 Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# P R O C E E D I N G S

THE CLERK:  Criminal No. 2011-116, *United States of America v. Thomas J. Ernst.*

MR. KREPP:  Good morning, Your Honor.  Thomas Krepp and Charles Connolly for the United States.

THE COURT:  Good morning.

MR. GOLDMAN:  Good morning, Your Honor.  Peter Goldman on behalf of Mr. Ernst who is present.

THE COURT:  Good morning.  Mr. Goldman, have you and your client had an opportunity to review this presentence report?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  Any corrections you wish to make to it?

MR. GOLDMAN:  None other than what we've already put in our papers, Your Honor, which I assume that the Court has reviewed.

THE COURT:  Is there anything you want to say at this time?

MR. GOLDMAN:  I do, Your Honor.  There are a few points in this case I would, apart from the papers, like to touch upon very briefly.  I know you have a full courtroom this morning.

First of all, Your Honor, let me sort of begin where typically I usually end in these cases.  We would request, as far as incarceration, a minimum, a recommendation of a minimum-security facility such as Allenwood, perhaps, for

1    Mr. Ernst.  I think that would be appropriate.  Also, the

2    government has agreed to let him self-report, most likely

3    sometime in January or February of this year.

4         Your Honor, I'm going to raise an issue for the record.

5    I have a sense of how I think the Court will rule on it, but

6    over the last couple of weeks in my discussions with Ms. Lauder

7    and then yesterday in my discussions with Ms. Ernst, I've come

8    to the conclusion that there is an important mental health

9    aspect to this case that I didn't detect at first, but it's

10   really been over the course of the last several weeks as I've

11   been approaching the sentencing date.

12        Let me assure Your Honor this is not a delay tactic.

13   It's not designed for that.  I would never do that with the

14   Court.  If the Court is in agreement and thinks it's important

15   enough to get some kind of mental health evaluation of

16   Mr. Ernst, we would recommend a continuance of the sentencing if

17   the Court deemed it appropriate.

18        But as I stated in my papers, Your Honor, and I think

19   without committing Ms. Lauder to the request I just made because

20   she's not part of that, but I did have a discussion with her in

21   her office and we are in agreement that there is a mental health

22   component to this case.  And if the Court wants to continue to

23   pursue that further, we would certainly not oppose it.

24        Your Honor, let me touch on a couple of points.

25        THE COURT:  Well, now, it's not what I want to do.

1    It's what you want to do.

2           Are you representing to me that there's some problem in

3    this case and can support that?

4           MR. GOLDMAN:  Your Honor, I would put it this way.  I

5    believe that a mental health evaluation could assist the Court

6    with a greater understanding of all of the factors in this case

7    and as relates to Mr. Ernst, and it could add a -- that

8    information from that report could add material information to

9    the Court's determination as to a sentence.

10          THE COURT:  So there's no question of him understanding

11   what he's doing and understanding where he is and right and

12   wrong and that sort of thing.

13          You just think that maybe some mental evaluation might

14   help me?

15          MR. GOLDMAN:  I do, Your Honor.  Again, all I can tell

16   you is I had the --

17          THE COURT:  Would that be true in every case that comes

18   before me?

19          MR. GOLDMAN:  No, I don't believe so, Your Honor.

20          I understand the point you're making, and it's a fair

21   one, sir, but I think in this case, as my dealings with

22   Mr. Ernst have gone on and on and after my discussion with

23   Ms. Lauder, I just -- there is a mental health component which

24   is why --

25          THE COURT:  Well, I suppose there's something wrong

1    with people's thinking every time they go out to break the law,

2    particularly when they do it on a scheme over a period of time.

3    There is something wrong with that.  It's hard to justify it.

4         But, you know, I'm troubled to come up here at the end,

5    we had a plea in this case, we've gone through the presentence

6    report, and now you're talking about a mental problem.  That's a

7    little troubling.

8         MR. GOLDMAN:  I understand, Your Honor.  If the Court

9    wants to proceed with sentencing, I understand that.  I

10   discussed it with my client yesterday, and I think we're in

11   agreement that we wanted to bring this before the record.  I'm

12   not trying to complicate the record for you.

13        THE COURT:  The trouble is you're not really telling me

14   anything.  I mean, you've given me no reason to order such a

15   report but yet you're raising the issue.  That's troubling.

16        MR. GOLDMAN:  I did sort of -- I did describe it, Your

17   Honor, in my papers.  I think that at times Mr. Ernst is not

18   rational.  I think at times he has trouble accepting things.  I

19   think there is a lack of common sense.

20        I'm not a psychiatrist, Your Honor, so I can't -- at a

21   certain point there's a limit as to my ability to describe the

22   situation to the Court and I think the Court's points about

23   everybody having some sort of problem that appears before this

24   Court in a criminal context having those issues.  I put it

25   before the Court.  If the Court wants to go forward with

1    sentencing today, I'm prepared to proceed.

2            THE COURT:  What does the government have to say about

3    this?

4            MR. KREPP:  Just so the Court is aware, this case was

5    indicted back in March.  It's been continued.  We did not object

6    to a continuance of the sentencing date.  The plea date was

7    July 26th.  The point of the continuance was so that Mr. Ernst

8    could get a forensic accountant.  I don't believe a forensic

9    accountant has been hired to examine the tax records or the bank

10   records.  I believe this is just another delay tactic.

11           THE COURT:  I just can't -- I can't get in my mind what

12   purpose are we going to have him examined.

13           Is it his competency?  Do you want me to send him to

14   Butner?

15           MR. GOLDMAN:  Your Honor, I don't think it's a basic

16   competency issue.  I just draw it to the Court's attention that

17   increasingly, as I have dealt with him, there is a mental health

18   component to the case that at first I didn't detect.

19           Given counsel's comments, we did in good faith, Your

20   Honor, seek an accountant to review records.  The problem we

21   had, Your Honor, is, one, Mr. Ernst could not identify and

22   produce the underlying documents that allowed us to do that

23   analysis, and I eventually became aware that the Fourth Circuit,

24   that the controlling case law takes a very limited view of this

25   Court's ability to factor in potential deductions and exemptions

1  from the --

2      THE COURT:  I'm not worried about that.  I'm worried

3  about this -- maybe what we ought to do is just simply remand

4  him to custody, I'll send him to Butner, and we'll find out

5  whether he has a problem or not.

6      MR. GOLDMAN:  Your Honor, I tell you what.  Why don't

7  we withdraw it then and just go forward with the plea.  At this

8  point I'll withdraw it with the plea.  I think we should go

9  forward.

10      Can I talk to my client for a moment, Your Honor?

11      THE COURT:  All right.

12      MR. GOLDMAN:  He is, Your Honor.  The reason we raise

13  this, Your Honor, he is under the care of a -- with the Veterans

14  Administration right now.  He is on medication for depression.

15  I bring this to the attention of the Court, Your Honor, not to

16  complicate the record and certainly not to antagonize the Court,

17  but I have an -- in the zealous --

18      THE COURT:  You're not antagonizing the Court, but

19  you're making a motion and without any grounds for it and

20  something that goes to the heart of the plea and the heart of

21  the case, and it's troubling to have it raised in this way.

22      Now, if he's under the care of a psychiatrist --

23  there's a lot of people under the care of a psychiatrist.

24  There's innumerable people in this country that have depression.

25  That's one thing.

1    You're asking for some kind of a mental examination.

2 And really, once it's raised, I probably ought to do it.

3        MR. GOLDMAN:  Your Honor, I'll tell what.  I will

4 withdraw the request and let's move forward with the plea.

5        THE COURT:  Is that what your client wants to do?

6        MR. GOLDMAN:  Yes, Your Honor.

7        THE COURT:  All right.

8        MR. GOLDMAN:  If I can touch on some other issues then

9 in the plea.

10        THE COURT:  You go ahead.

11        MR. GOLDMAN:  First of all, there is some talk in the

12 presentence report and the government has responded with great

13 alarm about Colorado mines and the potential purchase of new

14 healthcare businesses.

15        This sort of relates back a little bit to the mental

16 health issue.  Your Honor, Mr. Ernst may say -- and, frankly,

17 whether this Colorado mine investment exists or doesn't exist, I

18 don't know, Judge Hilton.  I don't think, for our purposes

19 today, I don't think it's that important.

20        What I do know is this.  Mr. Ernst is going to go

21 through some period of incarceration, I believe, and then he

22 will be on supervised release.  By the time he comes out, Your

23 Honor, in his early seventies, with the record of these criminal

24 convictions, with these felony convictions at his age and his

25 physical condition, Your Honor, he's not going to be buying any

1   new businesses.  He's not going to be -- his business and

2   professional career is over.

3        To the extent that there may be some mine investments

4   out there, Judge Hilton, he's going to be under supervised

5   release.  The government is going to swoop in and have a

6   constant review of any assets he has, and those assets are

7   plainly going to be seized for purposes of paying the tax

8   restitution.

9        I find that the government has completely overreacted

10  to this.  And strangely enough, they almost start to sound as

11  kind of wild-eyed as Mr. Ernst.  I think it's just a lot of --

12  Mr. Ernst has a tendency to puff.  I think it's a lot of talk.

13  I certainly don't give it any weight, and I would recommend to

14  the Court not to give it any weight.

15       I have told Mr. Ernst from the beginning of the case

16  and he is aware of the kind of scrutiny that he will be involved

17  in in his continuing connection with the criminal justice

18  system.  I think his post-incarceration life, Judge Hilton, will

19  look something much more like this.

20       He's going to live in a one-bedroom apartment with a

21  disabled wife.  He will get some sort of very, perhaps, small

22  job as -- I don't know -- as a cashier or in a retail place,

23  something like that, earn a *de minimis* amount of money.  He's

24  going to be using public transportation.  He's never going to

25  own a home again.  He's never going to own a car again.  His

financial life and professional life is over.  I think everybody, including the government, should calm down about that and stop reacting to every musing he may have had with Ms. Lauder in the probation office.

I want to address, Your Honor, the government's recommendation of 75 months because it comes late -- speaking of late, Your Honor -- it comes late in this case.  In the government's reply late yesterday afternoon, they pointed out that they never made a commitment to a time they would recommend in the plea papers, which is true, and of course in my papers I never said that.

What I referred to is that from the beginning of my representation, what they consistently talked to me about is requesting 51 months.  Are they free to come in here and ask for 75 months?  Yes, but I will tell you, Your Honor, a week before -- a week or so before a plea after a case has lasted this long to have this sort of request for the upward variance does come as more than a bit of a surprise.  More substantively, Your Honor, I don't think there's any justification in the record for it under the law and the facts.

The government claims -- there is a certain sense of alarm that the government counsel has approached this case. Plainly, Your Honor, Mr. Ernst's conduct was reprehensible and there are aspects of the case which are obnoxious and offensive. There's no question.  Having said that, when the government in

its papers talks about the case being unique, I respectfully
disagree with that, Your Honor. This is a man who didn't file
returns and pay his taxes and lived large and spent money
improperly. We know that. But that's not unique to tax cases.
That happens all the time. So let's distinguish between, you
know, what's unlawful, reprehensible, and obnoxious as opposed
to unique. I don't think that there are unique factors here in
any way justifying a sentence up to -- the upward variance up to
75 months.

Your Honor, I would ask the Court to consider two other
factors. That is, first, Your Honor, as I put in my papers,
when you're fashioning a sentence, and what I think this hearing
really is about today is the time that the Court's going to give
Mr. Ernst, consider the tremendous hit he's already taken in his
life as a result of this. I list those factors in my papers.
It's affected his health, his wife's health. It strained the
relations with his sons. He's filed for bankruptcy. He's lost
all of his assets. There are just a myriad of factors.

Plainly, Your Honor, Tom Ernst is responsible for all
of these. He doesn't come to this Court today to lay off the
blame on anyone other than himself, but in fashioning a
sentence, Your Honor, you're dealing with a 67-year-old man with
some health issues who's, apart from the time of incarceration,
Judge Hilton, is taking a tremendous hit. As I've already
described to you, Judge Hilton, when he is released and put on

1  supervised release, he's going to have -- his life is going to

2  be much smaller than it was and it will be that way to his last

3  days.

4        The other factors I ask the Court to consider with, I

5  think, with a degree of dispassion and objectivity, which

6  obviously the government is not bringing, is the fact that Tom

7  Ernst has done some good things in his life.  He served this

8  country honorably in the United States Air Force during the

9  Vietnam Era when military service was not considered to be so

10  popular.

11        He worked as a young man in the civil rights movement

12  for the SCLC in Alabama.  He did compile an excellent academic

13  record and was an outstanding student.  He, at one point, Your

14  Honor, was a staffer for Congress.  He served his country and

15  has done some things good.  Plainly, Judge Hilton, he lost his

16  way.  Plainly, the conduct we're here about today is simply

17  unacceptable, reprehensible, and has to be punished.

18        At the end of the day, the Court has to decide upon an

19  amount of time of incarceration.  We're going to leave -- I'm

20  going to leave it to the Court.  The government has asked for

21  75 months, which, frankly, I submit to you is unsupported by the

22  record and is over the top.  The guideline, the minimum

23  guideline, Your Honor, is 51 months.

24        I would respectfully submit, given the fact that he has

25  *de minimis* prior contact with the criminal justice system, at

his age and his condition and what his post-release life will

look like, which is it's going to be very small, Your Honor.

Your Honor, I've talked about 15 months in my papers.  I think

something in the 15, 30 -- I think once we get past the 15-,

25-, 30-month period of incarceration, what I would ask you,

Judge Hilton, is what's being accomplished?  Keeping this man in

jail for 4, 5, 6, or 75 months, at a certain point, when does it

become piling on?  When does it become punitive?  When is, sort

of, when is -- there's nothing remedial, constructive, or under

3553, under the 3553 factors, when is there something simply not

being accomplished?

I would respectfully submit, Your Honor, that if the

Court were to fashion a sentence -- I don't know -- of 20, 25,

30 months, after that, Judge Hilton, I don't really know what's

being accomplished, but we'll leave it to your wisdom and your

guidance in this.

With that, Your Honor, those are my remarks.  Thank

you.

MR. KREPP:  Your Honor, the government does not take

lightly its decision to seek an upward variant sentence.  We

believe the 3553(a) factors fully support the government's

recommendation of 75 months of incarceration.

First, Your Honor, this was a very serious offense.

I'm not going to detail everything the government laid out in

its position paper, but I'm sure the Court is well aware this

1   was a serious offense that took place over a great period of

2   time.  The defendant stole almost $4.5 million from the United

3   States government.  He did this by representing himself to be

4   somebody who could help the Postmasters, League of National

5   Postmasters run their benefits plan.  He did this by putting

6   forward a false $10 million bond.

7           Your Honor, what distinguishes this case from other tax

8   cases is the extent to which the defendant went to avoid paying

9   his taxes.  He used nominee accounts.  He put money in the name

10  of family members.  He took mortgages out in his sons' names

11  without telling them.

12          Your Honor, because of this it's had a direct impact,

13  not just on the U.S. Treasury, it impacted the National League

14  of Postmasters and it also impacted his own family members.  The

15  community must be protected, Your Honor.  The reason that the

16  mining contracts are important, it's not that the defendant was

17  musing with his probation officer.  There were documents upon

18  documents submitted to probation indicating that he had upwards

19  of $800 million in mining contracts right now.  It shows the

20  defendant will continue to submit false documents to whoever he

21  can.

22          Your Honor, as in any tax case, general deterrence is a

23  key consideration.  This is especially true in this case.  The

24  defendant went to such extreme lengths to avoid paying his

25  taxes.  He went to such extreme lengths to obstruct the services

1  of the IRS.  Because of that, an upward variant sentence is

2  appropriate.  It's sufficient but not more than necessary to

3  deter the defendant and deter others from committing future acts

4  like this.

5       Your Honor, unless the Court has any questions, I would

6  rest on our paper.

7       THE COURT:  Mr. Ernst, would you come to the podium.

8       Is there anything you want to say at this time?

9       THE DEFENDANT:  Yes, Your Honor.  Thank you.

10      I want to apologize to the Court and say how extremely

11  sorry I am.  I just want to balance the good things versus the

12  obvious bad things.

13      First, I embarrassed my family.  My father was an

14  assistant U.S. attorney.  He died when I was four of a heart

15  attack.  He's started at legal aid.  He had a great reputation

16  as a good and honest lawyer.

17      Your Honor, I tried to follow his example.  I started

18  with civil rights work in Alabama when it was both dangerous and

19  unpopular.  I lived on Dynamite Hill, so named because all of

20  the houses were blown up of lawyers and doctors in Birmingham.

21  And then, Your Honor, I worked in public health in TB control.

22  I would go into houses where there were active tuberculosis

23  cases and work with them trying to help them.

24      Your Honor, when I was in college, I was very active in

25  many different things.  I was named student of the year and then

1  I gained my master's degree in international relations at the
2  height of the Vietnam War.  I won fellowships to different
3  colleges, graduate school, so I had the option of going to
4  graduate school but turned it down.

5  I volunteered and enlisted and was recruited from
6  campus by CIA.  And they, as you know, have a very rigorous
7  training program, and I did all of that and went to The Farm and
8  learned about all of that.  I continued to work with the
9  intelligence services in the Air Force for a number of years.
10  Altogether, Your Honor, had over 22 years of public service, 5
11  years in Congress working on health matters.  So I've done a lot
12  of good things along the way.  I've taught a number of courses
13  in college.  Probably the most educated defendant but the
14  dumbest guy to come before you.

15  I wanted to just balance the good versus the obvious
16  mistake.  Thank you, Your Honor.

17  THE COURT:  Mr. Ernst, I find the guideline factors in
18  this case to be properly assessed at a range of 51 to 63 months,
19  but because of your financial condition, the imposition of any
20  fine or cost is not warranted.

21  Considering the factors that I must consider under
22  Section 3553, I find that a sentence near the low end of the
23  guideline range would be an appropriate one.

24  It will be the sentence of the Court, as to Count 1,
25  you be committed to the custody of the Attorney General to serve

1  a term of 36 months, a 1-year period of supervised release, and

2  pay a special assessment fine of a hundred dollars.

3        As to Count 2, that you be committed to the custody of

4  the Attorney General to serve a term of 12 months, a 3-year

5  period of supervised release, and pay a special assessment fine

6  of a hundred dollars.

7        There are a couple of conditions of your supervised

8  release.  One is that you undergo any mental health counselling

9  or monitoring that may be required by your probation officer;

10  and, second, that you provide any financial information that

11  your probation officer may request.

12        The supervised release terms in these two counts will

13  run concurrently with one another.  I will allow you to

14  voluntarily surrender yourself when space is available and will

15  recommend a minimum-security facility.

16        MR. GOLDMAN:  May I ask one question?

17        The sentences in Count 1 and 2, are they consecutive or

18  concurrent?

19        THE COURT:  Only the supervised release periods are

20  concurrent.

21        MR. GOLDMAN:  Thank you, Your Honor.

22        MR. KREPP:  Your Honor, we also have a restitution

23  judgment to be entered.

24        THE COURT:  If you'll hand that up to me, I'll enter

25  it.

1          MR. GOLDMAN:  My client signed it, Your Honor.

2          THE CLERK:  Criminal No. 2008-331, *United States of*

3  *America v. --*

4          THE COURT:  Excuse me a minute.  There's no amount in

5  this order.  Nobody's signed it.  Did you-all hand me the right

6  thing?

7          I'm sorry.  It is signed, but there is no amount.

8          MR. KREPP:  I apologize, Your Honor.  The plea

9  agreement states that the Court will determine an amount

10  appropriate.

11          THE COURT:  Well, wait a minute.

12          MR. KREPP:  We originally believed, with the hiring of

13  the forensic accountant, that we would be contesting the loss

14  amount of the sentencing, but there was -- it wasn't a contested

15  sentencing.

16          The government's position would be that the full loss

17  amount stated in the PSR, slightly under $4.5 million, is the

18  appropriate amount of restitution.

19          THE COURT:  Do you agree with that, Mr. Goldman?

20          MR. GOLDMAN:  That's fine, Your Honor.

21          THE COURT:  What's the sum?

22          MR. KREPP:  Your Honor, I have the sum right here.

23          It's $4,490,966.08.

24          THE COURT:  Okay.

25          MR. GOLDMAN:  That's correct, Your Honor.  Thank you.

1          * * *

2          (Proceedings concluded at 9:33 a.m.)

3

4

5                              CERTIFICATION

6

7          I certify, this 21st day of December 2011, that the

8  foregoing is a correct transcript from the record of proceedings

9  in the above-entitled matter to the best of my ability.

10

11                         /s/
                    _____
12                    Tracy Westfall, RPR, CMRS, CCR

13

14

15

16

17

18

19

20

21

22

23

24

25